```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/04/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
MARIA JOSE TUMBA HUAMANI,                                        :
                                                                 :
                          Petitioner,                            :
                                                                 :     25-cv-8110 (LJL)
        -v-                                                      :
                                                                 :     OPINION AND ORDER
LADEON FRANCIS, et al.,                                          :
                                                                 :
                          Respondents.                           :
                                                                 :
-----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Petitioner Maria Jose Tumba Huamani ("Tumba," or "Petitioner") petitions, pursuant to 28 U.S.C. § 2241, for a writ of habeas corpus. For the following reasons, her petition for a writ of habeas corpus is granted.[1]

## BACKGROUND

Petitioner is a twenty-year-old woman who was born in, and is a citizen of, Peru but who lives in New York. Dkt. No. 1 ("Pet.") ¶¶ 1, 8. She has no criminal convictions. *Id.* ¶ 8.

Petitioner and her mother arrived in the United States in May 2024 at or near Tecate, California. *Id.* ¶ 9; Dkt. No. 9 ("Finnie Decl.") ¶ 4. On May 6, 2024, she was stopped by a Border Patrol Officer with U.S. Customs and Border Protection ("CBP") who determined that she had unlawfully entered the United States without inspection. Finnie Decl ¶ 4. She was served with a Notice to Appear ("NTA") the next day charging her as inadmissible pursuant to

---

[1] Having reviewed the Petition, the materials filed in support thereof, and Respondents' opposition and accompanying declarations, the Court finds that the Petition "present[s] only issues of law," and it may, therefore, be adjudicated without a hearing. *See* 28 U.S.C. § 2243 (commanding courts to dispose of habeas petitions expeditiously, "as law and justice require"); *see also Kelly v. Almodovar*, 2025 WL 2381591, at *1 n.1 (S.D.N.Y. Aug. 15, 2025).

the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), which deems inadmissible those "present without being admitted or paroled who arrived at a place and time other than as designated by the Attorney General." *Id.* ¶ 5. The NTA directed Petitioner to appear in Immigration Court at 26 Federal Plaza, New York, New York on September 30, 2025. *Id.* ¶ 6. She also was served on May 7, 2024, with a Warrant for Arrest of Alien, Form I-220; an Order of Release on Recognizance, Form I-220A; and a Notice of Custody Determination, Form I-286, ordering her to appear for any hearing or interview. *Id.* She was released on her own recognizance that very day subject to the conditions that she report for any hearing or interview as directed by the Department of Homeland Security ("DHS") or the Executive Office for Immigration Review; that she surrender for removal from the United States if so ordered; that she not change her place of residence without securing written permission from an immigration officer; that she not violate any local, state or federal laws or ordinances; that she assist the Department of Homeland Security in obtaining any necessary travel documents; and that she report as otherwise required. Dkt. No. 10-3. Petitioner has a pending asylum application. Pet. ¶ 11.

On February 25, 2025, a petition was filed in the Family Court of the State of New York for Queens County for the appointment of a guardian for Petitioner. Dkt. No. 11-2. The application is part of the first stage of the process to obtain Special Immigrant Juvenile Status ("SIJS"), a form of immigration status created by Congress in the Immigration Act of 1990 to address the needs of young people who are dependent on a juvenile court in the United States, who have been abused, abandoned, or neglected by one or both parents, and who otherwise exhibit some kind of humanitarian need for relief. Dkt. No. 11-1 ("Rizio Decl.") ¶ 6. Regardless

2

of how they entered the country, children who are granted SIJS are eligible to apply for lawful permanent resident ("LPR") status. *Id.*[2]

Petitioner appeared pro se for her master calendar hearing on September 30, 2025, after her motion to appear by video was denied by the Immigration Court. Finnie Decl. ¶¶ 7–8. At the hearing, an Immigration Judge confirmed Petitioner's address and that her primary language was Spanish, instructed her that she was required to notify the Immigration Court of any change of address within five days of moving, and advised her of the consequences of failing to appear for future hearings. *Id.* ¶ 8. She was also provided a list of pro bono attorneys. *Id.* The Immigration Judge set a future master calendar hearing date of May 12, 2026. *Id.*

Upon exiting that hearing, Petitioner was followed and taken into custody by a group of masked agents from Immigration and Customs Enforcement ("ICE") as she headed toward an elevator to exit 26 Federal Plaza. Pet. ¶ 13; Finnie Decl. ¶ 9. She was afforded a phone call and ICE notified the consulate of Peru of her arrest and detention. Finnie Decl. ¶ 9. She was given no notice that she would be arrested.

On October 6, 2025, Petitioner completed the first stage of the SIJS process when the Queens County Family Court appointed Petitioner's mother as her guardian until Petitioner reaches the age of 21. Dkt. No. 11-2.

## PROCEDURAL HISTORY

This Petition for a writ of habeas corpus was filed on October 1, 2025, while Petitioner was detained in 26 Federal Plaza, New York, New York. Dkt. No. 1; Finnie Decl. ¶ 9. On October 14, 2025, Respondents filed a memorandum of law in opposition to the Petition. Dkt.

---

[2] *See* 8 U.S.C. § 1101(a)(27)(J) (setting forth the requirements for special immigrant juvenile status); 8 C.F.R. § 204.11 (explaining the requirements thereof); *see also* USCIS Policy Manual, Volume 6, Part J - Special Immigrant Juveniles, https://www.uscis.gov/policy-manual/volume-6-part-j.

No. 8. Respondents also filed the declaration of Christopher Finnie and a series of exhibits. Dkt. Nos. 9–10. On October 17, 2025, Petitioner filed a reply memorandum of law in further support of the Petition. Dkt. No. 11. On October 27, 2025, Petitioner filed a notice of supplemental authority in further support of the Petition. Dkt. No. 12.

Petitioner is now detained in the South Louisiana ICE Processing Center in Basile, Louisiana, to which she was transferred on October 2, 2025. Finnie Decl. ¶ 11.

## LEGAL STANDARD

Petitioner brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)). "Federal courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the constitutionality of their detention." *Lopez v. Sessions*, 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Denmore v. Kim*, 538 U.S. 510, 516–17 (2003)).

## DISCUSSION

### I. Procedural Due Process

#### A.   Petitioner Is Detained Under 8 U.S.C. § 1226

The Government argues that because Petitioner is an applicant for admission, her detention is mandatory under 8 U.S.C. § 1225(b)(2)(A). Petitioner responds that because she has been present in the United States for over a year, her detention is governed instead by 8 U.S.C. § 1226(a). Detention pending adjudication of removal under Section 1226 is discretionary and affords noncitizens detained thereunder the right to an initial determination as to eligibility for release and the opportunity for a bond hearing upon detention. 8 C.F.R. § 1236.1(d)(1).

Respondents' argument is as follows.  Per the INA, an "alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for the purposes of this chapter as an applicant for admission."  8 U.S.C. § 1225(a)(1).  An applicant for admission who is "seeking admission" "shall" be detained under Section 1225(b)(2) unless the applicant is "clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A).  The only exception to that mandatory "shall" is if DHS decides in its discretion to parole the noncitizen under 8 U.S.C. § 1182(d)(5)(A).  "Other than this limited exception," "detention under § 1225(b)(2) is considered mandatory."  *Lopez Benitez v. Francis*, 2025 WL 2371588, at *3 (S.D.N.Y. Aug. 13, 2025).  Petitioner's residence in the United States for over a year is irrelevant in Respondents' view.  Because Petitioner has not been admitted, Respondents argue, she is an applicant for admission; and because she has not been paroled under Section 1182(d)(5)(A), her detention is mandatory, and she has no due process rights other than those granted her by Congress.

Petitioner argues that her case is not governed by Section 1225(b)(2) because she is not an alien "seeking admission into the country."  Even if she is an "applicant for admission," she is not "seeking admission" currently because she is "already in the country pending the outcome of removal proceedings."  *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018).  Section 1226 "generally governs the process of arresting and detaining [non-citizens who have already entered the United States] pending their removal."  *Id.* at 288.  Under Section 1226, "an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a) (emphasis added).  Detention is therefore discretionary, and the noncitizen may be released upon application on either bond or "conditional parole."  *Id.* § 1226(a)(2)(B); *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021).  "Critically, under 8

5

C.F.R. § 1236.1(d)(1), a noncitizen detained under § 1226 may appeal an 'initial custody determination,' including the setting of bond, to an immigration judge." *Lopez Benitez*, 2025 WL 2371588, at *3 (quoting *Martiez v. Hyde*, 2025 WL 2084238, at *7 (D. Mass. July 24, 2025)).

Petitioner has the better argument. Although Tumba is technically an "applicant for admission" because she has not been formally admitted to the United States, it does not follow that she is necessarily "seeking admission" under Section 1225(b)(2). That conclusion might sound counterintuitive at first, but it stems from a straightforward reading of the statute. Section 1225(b)(2) applies only to "an alien who is an applicant for admission" who is "seeking admission." 8 U.S.C. § 1225(b)(2)(A). If the "examining immigration officer" determines that a noncitizen who is "an applicant for admission" and who is "seeking admission" is not clearly and beyond doubt entitled to be admitted, detention is mandatory. *Id.* Thus, following the cardinal rule of statutory interpretation that "every clause and word of a statute should have meaning," *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023), for Section 1225(b)(2) to apply, the noncitizen must be an "applicant for admission" and be "seeking admission." "If, as Respondents argue, § 1225(b)(2)(A) were intended to apply to all 'applicant[s] for admission,' there would be no need to include the phrase 'seeking admission' in the statute." *Lopez Benitez*, 2025 WL 2371588, at *6. It is not enough for Section 1225(b)(2) to apply that the noncitizen carries the status of applicant for admission.

At first glance, it is not apparent what independent work the term "seeking admission" does in Section 1225(b)(2), as one who is applying for something is often also seeking something in the colloquial sense. *See J.G.O. v. Francis*, 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025) (noting that this question "is puzzling at first blush. How can an 'applicant for admission'

6

not 'seek admission?'"). It might appear that the terms are redundant. They are not. The statutory definition of an "applicant for admission" is a noncitizen "present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a). And "admission" is itself a term of art. It is defined by the INA as "the lawful entry of the alien into the United States after inspection and authorization by the immigration officer." 8 U.S.C. § 1101(a)(13)(A). The term "applicant for admission" is thus something of a misnomer. It "doesn't require an application of any sort. All that's needed is presence without admission—in other words, it applies to the great number of undocumented immigrants who currently live" in this country. *J.G.O.*, 2025 WL 3040142, at *3. Not all "applicants for admission" are "seeking admission." "By contrast, 'seeking admission' might mean something more than that—some active desire of process toward admission." *Id.*

A construction of the statute that understands noncitizens already present in the United States and subject to removal proceedings to necessarily be "seeking admission" subject to Section 1225(b)(2) would also be entirely inconsistent with the Laken Riley Act. *See* Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025) (codified as amended at 8 U.S.C. § 1226(c)(1)(E)). Passed earlier this year, the Act "makes noncitizens subject to mandatory detention if (1) they are inadmissible under certain provisions of 8 U.S.C. § 1182 and (2) are charged with, arrested for, convicted of, or admit to having committed certain crimes." *Artiga v. Genalo*, 2025 WL 2829434, at *7 (E.D.N.Y. Oct. 5, 2025) (citing 8 U.S.C. § 1226(c)(1)(E)). By Respondents' understanding, all noncitizens inadmissible under 8 U.S.C. § 1182(a)(6) (which states that those like Petitioner who are present without admission are inadmissible) are *already* subject to mandatory detention. Why, then, would Congress have thought it necessary to specifically add a

provision making those noncitizens subject to mandatory detention if they are charged with certain crimes? The Government has no answer. As one court recently explained,

> If Section 1225(b)(2) applied to noncitizens who are arrested on a warrant while residing in the United States, it would render Section 1226(c)(1)(E)'s criminal conduct criterion superfluous whenever the noncitizen is inadmissible under Sections 1182(a)(6)(A) or (a)(7). Such an interpretation, which would largely nullify a statute Congress enacted this very year, must be rejected. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

*Gomes v. Hyde*, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025); *see Artiga*, 2025 WL 2829434, at *7; *Samb v. Joyce*, 2025 WL 2398831, at *3 (S.D.N.Y. Aug. 19, 2025); *Gonzalez v. Joyce*, 2025 WL 2961626, at *4 (S.D.N.Y. Oct. 19, 2025).

Respondents' reading of Section 1225 would also all but read Section 1226 off the books—if "anyone who has entered the country unlawfully, regardless of how long they have resided here, is subject to mandatory detention under § 1225(b)(2)(A), then it is not clear under what circumstances § 1226(a)'s authorization of detention on a discretionary basis would ever apply." *Lopez Benitez*, 2025 WL 2371588, at *8. "Perhaps it might still apply to a subset of noncitizens who are lawfully admitted (e.g. on a visa of some sort), and who remain present unlawfully. But there is no indication that Congress intended § 1226 to be limited only to visa overstays." *Id.* In fact, the statutory scheme indicates to the contrary that "[t]ogether" the sections "cover aliens presenting at arrival (under § 1225) and then everybody else (under § 1226)." *J.G.O.*, 2025 WL 3040142, at *4. And, as Respondents acknowledge, their understanding that Section 1225 applies to someone like Petitioner is a recent one; the Government has long understood Section 1226 to govern noncitizens who enter the United States without inspection. Pet. ¶ 4. "If Congress had wished to enact the transformation of the immigration detention system that Defendants contend it did—requiring the detention of millions

8

of people currently living and working in the United States—then it would have said so more clearly." *Rodriguez v. Bostock*, 2025 WL 2782499, at *24 (W.D. Wash. Sept. 30, 2025).

In line with understanding the terms "applicant for admission" and "seeking admission" to have distinct meanings, DHS's own regulations understand an "applicant seeking admission" to be synonymous with an "arriving alien." *Lopez Benitez*, 2025 WL 2371588, at *7 (citing 8 C.F.R. § 235.3(c)(1)). And an "arriving alien" is "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1001.1. Such a position by the DHS, "while not binding, can still 'provide a useful reference point for understanding a statutory scheme, particularly where those regulations were issued roughly contemporaneously with enactment of the statue and have remained consistent over time.'" *Lopez Benitez*, 2025 WL 2371588, at *7 n.8 (quoting *Martinez v. Hyde*, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025)). The relevant implementing regulations were "'promulgated mere months after the passage of the statute' and have remained consistent over time." *Id.* at *7 (quoting *Martinez*, 2025 WL 2084238, at *6).

Thus, a noncitizen who has entered the country, even illegally, and is apprehended by CBP after entry is not subject to the mandatory detention provision of Section 1225, and is instead subject to the discretionary detention provision of Section 1226. This construction of the INA is hardly novel in the context of the United States' immigration law more broadly. "[O]ur immigration laws have long made a distinction between those aliens who come to our shores seeking admission . . . and those who are within the United States after entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes.").

9

Indeed, Respondents themselves understood Petitioner to been subject to Section 1226 rather than to Section 1225 and so informed her. When Petitioner was stopped by CBP on May 6, 2024, the warrant under which she was arrested stated expressly that she was "within the country in violation of the immigration laws and is therefore liable to being taken into custody as authorized by section 236 [8 U.S.C. § 1226] of the [INA]." Dkt. No. 10-1. The NTA served on Petitioner the same day states that she is "an alien present in the United States who has not been admitted or paroled," and clarifies that she is *not* "an arriving alien." Dkt. No. 10-2. Furthermore, Petitioner was then released on her own recognizance, Dkt. No. 10-3, a form of relief available only under 8 U.S.C. § 1226(a)(2)(B), and not under Section 1225(b)(2). The Government "use[s] the phrase 'release on recognizance' as another name for 'conditional parole' under § 1226(a)." *Ortega-Cervantes v. Gonzalez*, 501 F.3d 1111, 1115 (9th Cir. 2007); *see Cruz-Miguel v. Holder*, 650 F.3d 189, 191 (2d Cir. 2011). The "Notice of Custody Determination" served on Petitioner also makes express that her release on her "own recognizance" was "[p]ursuant to the authority contained in section 236 of the [INA]." Dkt. No. 10-4. For a year, Petitioner has been living in the United States on the understanding that she would be arrested and detained under Section 1226 only if she did not attend immigration hearings as required or otherwise showed herself to be a danger. Instead, the Government would now treat her as subject to arrest and mandatory detention for an indeterminate period at any time and for any reason solely at its whim and without any showing that her detention was statutorily required or furthered any governmental interest.

The Government appears to have understood that Tumba was subject to Section 1226 until the moment it had to defend Petitioner's detention in this litigation. The warrant for arrest served on Petitioner on September 30, 2025 recognizes, too, that the arrest is "pursuant to"

Section 1226, not 1225. Dkt. No. 10-5. "[A] noncitizen cannot be subject to both mandatory detention under § 1225 and discretionary detention under § 1226," so if Petitioner was "detained pursuant to one provision, [she] cannot be subject to the other." *Lopez Benitez*, 2025 WL 2371588, at *4.[3]

Under Section 1226, Petitioner's detention is discretionary rather than mandatory. 8 U.S.C. § 1226(a)(1) ("[P]ending a decision on whether the alien is to be removed from the United States," DHS "may continue to detain the alien."). In May 2024, CBP exercised that discretion and released Petitioner from her brief confinement on her own recognizance (in other words, she was released on "conditional parole"). *Id.* § 1226(a)(2)(B); Dkt. No. 10-3. She entered the country. As Respondents concede, "[t]o secure release, the alien must show that he does not pose a danger to the community and that he is likely to appear for future proceedings." *Johnson*, 594 U.S. at 527 (citing 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8)); *see Cruz-Miguel*, 650 F.3d at 198 ("[C]onditional parole merely permits an alien to remain at liberty based on a determination that he poses no risk of danger or flight *while is removal is actively sought*."). "Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). Petitioner presumably made that showing, as that is the only authority under which she could have been released on her own recognizance.

---

[3] Respondents do not argue that they changed the basis upon which Petitioner was released into the United States at some point after she was released on her own recognizance or before her arrest in this case. If they had argued as much, that too would raise significant due process concerns. *See Obeya v. Sessions*, 884 F.3d 442, 445 (2d Cir. 2018). The Court need not address those concerns here.

Having determined that Petitioner's detention is governed by Section 1226, the Court need not address the Government's arguments that, were she detained pursuant to Section 1225, her detention is mandatory.[4] Rather, the Court next addresses whether her due process rights have been violated as a non-admitted noncitizen who is nevertheless present in the United States.

### B.     Petitioner's Due Process Rights Were Violated

The Due Process Clause of the Fifth Amendment prevents the Government from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. It is well established that such protection extends to noncitizens, including those who are in removal proceedings. *See id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Reno v. Flores*, 507 U.S. 292, 306 (1993). The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).

Upon her initial arrest in May 2024, the CBP officer granted Petitioner conditional parole and permitted her entry on the basis that she was neither a danger to the community nor a flight

---

[4] For this reason, Respondents' citation to cases elaborating that under the "entry fiction" an applicant for admission is treated as if they are stopped at the border for purposes of due process are inapposite. *See* Dkt. No. 8 at 7–10; *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 114 (2020) (noncitizen detained pursuant to Section 1225).

12

risk. Dkt. No. 10-3. When she was arrested and detained after attending her immigration hearing on September 30, 2025, Tumba "received neither notice nor an opportunity to be heard as to whether a change in custody status was warranted." Pet. ¶ 33. At that moment, however, she was entitled to an opportunity to request conditional release, and an individualized initial determination by a DHS officer as to that request. Neither at the time of her detention nor in litigating her habeas petition before this Court have Respondents argued that Petitioner is either a flight risk or a danger to the community, or that there exists any other basis upon which they have determined that she should no longer be at liberty on her own recognizance. "In fact, nothing in the record reflects . . . (1) who made the decision to detain [her], (2) when that decision occurred, (3) on what basis the decision to detain [her] was made, (4) whether there was any material change in circumstances with respect to [her] that triggered his detention, or (5) whether there was any sort of new policy in place that triggered [her] detention." *Lopez Benitez*, 2025 WL 2371588, at *11. The Government does not acknowledge Petitioner's allegations of a "nationwide campaign to detain people attending their immigration court hearings." Pet. ¶ 14.

It is undisputed that the Government retains significant discretion in revoking conditional parole—it may do so "at any time." 8 U.S.C. § 1226(b); *see also* 8 C.F.R. § 1236.1(c)(9) ("When an alien who, having been arrested and taken into custody, has been released, such release may be revoked at any time in the discretion of" the relevant officer, "in which event the alien may be taken into physical custody and detained.") But Due Process still requires that such discretion actually be exercised—i.e., that some determination actually be made. Here, "there is nothing to suggest that DHS exercised any discretion *at all* in detaining" Petitioner. *See Lopez Benitez*, 2025 WL 2371588, at *11; *Chipantiza-Sisalema v. Francis*, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025). Indeed, it is difficult to imagine a detention process more arbitrary

13

than that suffered by Petitioner here.  Upon exiting her immigration hearing on September 20, 2025, Petitioner was trailed into the elevator by three ICE agents.  Pet. ¶ 13.  All three wore masks; one wore sunglasses; and two wore New York Yankees baseball hats.  *See* Anna Ley, *Journalist Injured in Chaotic Scene at New York Immigration Court*, N.Y. Times, Sept. 30, 2025, https://www.nytimes.com/2025/09/30/nyregion/journalist-injured-immigration-courthouse.html.[5]  After the ICE agents entered the elevator, several journalists attempted to follow.  *Id.*  In forcefully ejecting the journalists from the elevator, the ICE agents threw at least two journalists to the ground.  *Id.*  One was subsequently hospitalized.  *Id.*  Petitioner was detained thereafter.  Pet. ¶ 13.

Considering the complete absence of any reason for Petitioner's arrest under Section 1226, either in the record or in the briefing, this Court cannot conclude that her violent re-detention is compliant with the mandates of the Due Process Clause.  Tumba does not argue that she could not be detained under 8 U.S.C. § 1226 pending the adjudication of her claim for asylum—only that before the Government does so, it must make a discretionary determination that she no longer presents a risk of flight or danger to the community.  *See Valdez v. Joyce*, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) ("[T]he issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention.").  "[T]reating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process."  *Lopez Benitez*, 2025 WL 2371588, at *15.  And the "suggestion that government agents may sweep up any person they wish, for [no] reason [whatsoever] . . . so long as the person will, at some unknown point in time, be allowed to ask

---

[5] In the video embedded in the New York Times story, Petitioner is wearing a striped shirt.  Pet. ¶ 13.

14

some other official for his or her release offends the ordered system of liberty that is the pillar of the Fifth Amendment." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3 (citing *Velasco Lopez*, 978 F.3d at 851–52; *Valdez*, 2025 WL 1707737, at *3–4).

### C.     Administrative Exhaustion

Respondents argue that the Court should not grant Petitioner immediate relief.  They assert that if Section 1226 applies, Petitioner is entitled to a bond hearing—and that because she is entitled to a bond hearing, she cannot seek habeas relief until she receives such a hearing.  But the Government's argument misunderstands Petitioner's claim.  Petitioner does not complain about an abuse of discretion by a DHS officer, or that she is being subject to prolonged detention.  She contends that DHS exercised no discretion whatsoever.  Having promised her that she was being released on her own recognizance under Section 1226, DHS then restrained her liberty without any due process.  If Petitioner's initial detention itself was consistent with due process, Petitioner would undoubtedly be entitled to a bond hearing pursuant to 8 U.S.C. § 1226.  But the Government's violation of Petitioner's constitutional rights originated with her detention in the first instance.

That Petitioner's detention violated her due process rights, and that a bond hearing could not cure that constitutional violation, is evident also from the scheme envisioned by the statute and regulations.  A CBP officer must make an initial determination as to conditional release based on the noncitizen's danger to the community and risk of flight.  8 C.F.R. § 236.1(c)(8).  If DHS declines to grant conditional parole, or grants it but later re-detains the noncitizen, the noncitizen has the right to make a "custody or bond" "request," which is decided by an Immigration Judge "based upon any information that is available."  8 C.F.R. § 1003.19(d).  That bond hearing is "separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding."  *Id.*; *see* 8 C.F.R. § 1236.1(d) ("After an initial custody determination,"

15

"the respondent may, at any time before an order [of removal] becomes final, request amelioration of the conditions under which he or she may be released."). If the Immigration Judge declines to release the noncitizen, or sets a bond value that is too high, the noncitizen can appeal that decision to the Board of Immigration Appeals. 8 C.F.R. §§ 236.1(d)(3), 1003.19(f).

The implementing regulations of the INA clarify that the bond hearings "are provided for the purpose of custody *re*-determination—a hearing held by an immigration judge after ICE makes its initial decision to detain." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3 (citing 8 C.F.R. § 236.1(d)(1)); *see* 8 C.F.R. § 236.1(d) ("Application to immigration judge. After an initial custody determination . . . the respondent may . . . request amelioration of the conditions under which he or she may be released."); *see also Johnson*, 594 U.S. at 527 ("If DHS denies the alien's request, the alien may request a bond hearing in front of an immigration judge."). Here, the issue is that there is no "initial decision" that Tumba could have "appeal[ed]." Accordingly, "[s]uch a hearing is no substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3; *cf. Velesaca Lopez v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) ("[T]he fact that Plaintiffs may seek review by an IJ of their initial bond determination does nothing to mitigate the harm to Plaintiffs in the time they are in detention awaiting review.").

"Judicial exhaustion may be excused when 'available remedies provide no genuine opportunity for adequate relief' or exhaustion 'would be futile.'" *Kelly*, 2025 WL 2381591, at *3 (quoting *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003)). As explained above, that exception applies here. Addressing a similar argument, one court recently explained:

> [G]iven the nature of the constitutional violation [petitioner] sustained here—i.e., Respondents' failure to conduct any kind of individualized

16

> assessment *before* detaining him—any post-deprivation review by an immigration judge would be inadequate. This is particularly so given that "[d]etention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded." *Velasco Lopez*, 978 F.3d at 852. Accordingly, "Respondents' suggestion that [petitioner] has an adequate remedy available to [him] . . . rings hollow," and the first exhaustion exception applies here. *Chipantiza-Sisalema*, 2025 WL 1927931, at *3.

*Lopez Benitez*, 2025 WL 2371588, at *14; *see Kelly v. Almodovar*, 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025). Respondents' administrative exhaustion argument thus does not alter Petitioner's entitlement to the writ of habeas corpus.

## II.  Relief

Tumba seeks the "typical remedy" for "unlawful executive detention," which "is, of course, release." *Munaf v. Green*, 553 U.S. 674, 693 (2008). "[T]he traditional function of the writ is to secure release from illegal custody"; it is the "usual remedy by which a man is restored again to his liberty, if he ha[s] been against law deprived of it." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (internal citation omitted). The Court has determined that the Government violated Petitioner's procedural due process rights under the Constitution, and she is therefore entitled to release.

In her briefing, Petitioner points the Court to a three-part test elaborated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976) for determining what process is due where a noncitizen's due process rights have been violated. In *Black v. Decker*, the Second Circuit held that the test laid out in *Mathews* is the correct framework to use in determining "when and what additional procedural protections are due" to someone challenging the length of their detention. 103 F.4th 133, 138 (2d Cir. 2024), *reh'g en banc denied*, 2025 WL 2989687 (2d Cir. Oct. 24, 2025). As this Court recently explained:

> [T]he reasoning of *Black* in applying that framework is inapposite considering the procedural posture of [petitioner's] habeas petition. In *Black*, both petitioners "agree[d]" that the government could detain them without an initial bond

17

> determination under Section 1226(c), and argued only that "their prolonged detentions without a bond hearing violated their due process rights." *Id.* at 142. On that basis, the Second Circuit then held that "due process challenges to prolonged detention under section 1226(c) should . . . be reviewed under *Mathews*." *Id.* at 147. [Petitioner], on the other hand, has not sought a writ of habeas corpus on the basis that he has been detained too long; he submitted his petition the very day he was arrested. He argues instead that his detention was invalid at its inception . . . .

*Rojas Acevedo v. Almodovar*, 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025). That reasoning applies equally to Tumba. She argues that her detention was illegal from the start because of the lack of any due process. Respondents do not argue that Petitioner was afforded any sort of process before her re-detention. "Respondents' ongoing detention of Petitioner with no process at all, much less prior notice, no showing of changed circumstances, or an opportunity to respond, violates [her] due process rights." *Valdez*, 2025 WL 1707737, at *4. She is therefore entitled to release.

### III.     Petitioner's Remaining Arguments

Having determined that Petitioner's procedural due process rights were violated, and that she is entitled to a writ of habeas corpus on that basis, the Court does not address her alternative arguments that her substantive due process rights were violated, that her Fourth Amendment rights were violated, or that Respondents' actions violated the Administrative Procedure Act.

18

**CONCLUSION**

The petition for a writ of habeas corpus is GRANTED. Respondents are ORDERED to immediately release Tumba from custody and certify compliance with the Court's order by filing an entry on the docket no later than 12:00 p.m. on November 5, 2025.[6]

SO ORDERED.

Dated: November 4, 2025
      New York, New York

                                                LEWIS J. LIMAN
                                          United States District Judge

---

[6] Petitioner has only requested her immediate release. Several courts to have addressed similarly situated petitioners have also, in granting a writ of habeas corpus, instructed the respondents to transport the petitioner back to the Southern District of New York before releasing them from custody. *See Lopez Benitez*, 2025 WL 2371588, at *15; *Zhu v. Genalo*, 2025 WL 2452352, at *10 (S.D.N.Y. Aug. 26, 2025). The Court would entertain any request from Petitioner to modify its Order to that effect after Petitioner has met and conferred with the Government.